# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 9, 2013 Session

## KATHLEEN BAKER AND RICK BAKER v. DEBORAH A. SNEDEGAR

**Appeal from the Circuit Court for Davidson County**
**No. 07C1158, 05C3627     Joseph P. Binkley, Jr., Judge**

---

**No. M2012-02348-COA-R9-CV - Filed October 8, 2013**

---

Plaintiff filed suit against a medical legal examiner alleging the medical legal examiner was negligent in failing to inform her of certain preventative medications. The medical legal examiner contended she was a government employee protected from liability by the Governmental Tort Liability Act and moved for summary judgment. The trial court denied the motion because the medical legal examiner could not prove she was paid by the payroll department of the governmental entity at issue, as required by Tenn. Code Ann. § 29-20-107(a)(2). The medical legal examiner appealed, and we affirm the trial court's judgment.

**Tenn. R. App. P. 9 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Thomas M. Pinckney, Susan Duvier Bass, Nashville, Tennessee, for the appellant, Deborah A. Snedegar.

Marshall Herbert McClarnon, Donald D. Zuccarello, Nashville, Tennessee, for the appellees, Kathleen Baker and Rick Baker.

## OPINION

This case involves the meaning of the term "government employee" for purposes of the Tennessee Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. §§ 29-20-101 *et seq.*, specifically, whether an individual employed by Nashville General Hospital at Meharry ("NGH") as a medical legal examiner ("MLE") qualifies as a government employee for purposes of the Act under the circumstances of the relationship proved herein.

# I. BACKGROUND

Deborah A. Snedegar was working as an MLE on the evening of November 29, 2004, when Kathleen Baker was brought into NGH after suffering a sexual assault. She performed a forensic examination and claims she followed the protocol NGH had in place for MLE's to follow when performing their forensic examinations.

Ms. Baker contends Ms. Snedegar did not discuss or inform her of the option of using certain medications to prevent, treat, or control potential infection or disease. A few months later Ms. Baker learned she had contracted a virus that could have been prevented, she alleges. Ms. Baker then filed a negligence complaint against Ms. Snedegar in which she alleged Ms. Snedegar failed to use due and reasonable care in her role as an MLE.[1]

Following discovery, Ms. Snedegar filed a motion for summary judgment in which she argued she was a government employee for purposes of the GTLA and, thus, immune from suit, because the government was not a defendant in the case. In relevant part, Tenn. Code Ann. § 29-20-310(b) provides,

> No claim may be brought against an employee or judgment entered against an employee for damages for which the immunity of the governmental entity is removed by this chapter . . . .

Ms. Snedegar argued that since NGH was not a defendant in the case, she could not be sued if she could prove she was an employee of NGH, a governmental entity. The GTLA defines a governmental employee as follows:

> (a) Any person who is not an elected or appointed official or a member of a board, agency or commission shall not be considered an employee of a governmental entity for purposes of this chapter unless the court specifically finds that all of the following elements exist:
>
> (1) The governmental entity itself selected and engaged the person in question to perform services;
>
> (2) The governmental entity itself is liable for the payment of compensation for the performance of such services and the person receives all of such person's

---

[1] Ms. Baker and Rick Baker sued NGH and other individuals and entities in addition to Ms. Snedegar, but those other defendants have either settled with the Bakers and/or been dismissed from the case. Ms. Snedegar is currently the only defendant left in the case.

compensation directly from the payroll department of the governmental entity in question;

(3) The person receives the same benefits as all other employees of the governmental entity in question including retirement benefits and the eligibility to participate in insurance programs;

(4) The person acts under the control and direction of the governmental entity not only as to the result to be accomplished but as to the means and details by which the result is accomplished; and

(5) The person is entitled to the same job protection system and rules, such as civil service or grievance procedures, as are other persons employed by the governmental entity in question.

The parties agree Ms. Snedegar's employment as an MLE was a part-time position. The requirements set forth in (a)(3) and (a)(5) are modified for part-time workers by section (e):

(e) Persons who are employed in part-time, seasonal, or probationary positions by a governmental entity shall not be disqualified by subdivision (a)(3) or (a)(5) from the immunity granted by this chapter if they receive the same benefits or are subject to the same job protection system and rules as other persons employed by that government in comparable part-time, seasonal, or probationary positions.

## II. TRIAL COURT'S RULING

The trial court held an evidentiary hearing in December 2011 on Ms. Snedegar's motion for summary judgment. Ms. Snedegar testified at the hearing and portions of depositions were read into evidence. The trial court then held additional hearings in April and July 2012. Based on the evidence presented and arguments of counsel, the trial court denied Ms. Snedegar's motion. The court issued a ruling in July holding that Ms. Snedegar did not satisfy the second part of section (a)(2), which requires that she receive all of her compensation directly from the payroll department of NGH. At the end of the hearing in April 2012 the court explained its ruling in open court as follows:

All the payments are [from] Metro Government under the Department of Finance. But as I understand from Mr. Latham's testimony, they have an account where they pay traditional employees, where they take out social

-3-

security, tax, Medicare, that kind of thing. Then they have other, and I think there's maybe several different accounts, but I refer to them as vendors, people who do business with Metropolitan Government. And they're not employees, they're people who do business with Metropolitan Government. I think that's who Nurse Snedegar - - I think that's where she falls.

But back to 29-20-107(a)(2), the second part, and the person receives all such person's compensation directly from the payroll department of the governmental entity in question. The legislature put that there for a reason. And the way the Metropolitan Government works, this governmental entity we're dealing with in this case, they have different accounts by which they pay different types of people who do work for the Metropolitan Government, employees and vendors . . . .

I think there is a distinction. If there was not a distinction, then everybody who got paid by the Metropolitan Government Department of Finance, they'd all be the same, and they're not the same. And there is a differentiation in how these different people are paid. Traditional employees are paid from a certain account, and other people, who are like vendors, who do business with the Metropolitan Government, are paid from another account, and that is the distinction. And I don't think the payroll department was paying Ms. Snedegar, or any other vendors, or any other people who are doing business with Metropolitan Government as opposed to traditional employees. So payroll department, I think in this context, is very similar, if not the same, as a payroll account.

And Ms. Snedegar, Nurse Snedegar, is not paid out of the payroll account, she's paid out of the other account, which I'm going to refer to as a vendor account, because she has a vendor number. She's like other people who do business with Metropolitan Government. Like there are different categories of people who do business with Metropolitan Government. But for purposes of separation, I'm going to say that she's in the vendor category versus the people who - - the traditional employees who are paid out of the payroll department payroll account.

So that's my ruling - - and to rule any other way would not make any sense, because everybody would be treated the same. And there has to be a distinction, and there's a reason for that.

Ms. Snedegar sought permission to file an interlocutory appeal, which this Court

granted, to review the trial court's ruling that Ms. Snedegar, in her role as an MLE at NGH in 2004, did not qualify as a "government employee" for purposes of the GTLA as that term is defined in Tenn. Code Ann. § 29-20-107(a).

### III. ANALYSIS

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Id.*

The moving party has the burden of demonstrating it is entitled to judgment as a matter of law and that there are no material facts in dispute. *Martin*, 271 S.W.3d at 83; *McCarley v. West Quality Food Service*, 960 S.W.2d 585, 588 (Tenn. 1998). To be entitled to summary judgment, a defendant moving party must either (1) affirmatively negate an essential element of the non-moving party's claim or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 9 (Tenn. 2008). If the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of a genuine issue of material fact. *Martin*, 271 S.W.3d at 84; *Hannan*, 270 S.W.3d at 5; *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 86 (Tenn. 2000) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all reasonable inferences. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

Billy Latham was the Director of Finance at NGH in 2004, and he gave a deposition regarding the payment of employees and others who worked at NGH. Mr. Latham testified that NGH did not have a payroll department or a separate department to process payroll. He explained that an employee of NGH was also an employee of Metro, and all payroll functions were performed by the Department of Finance, which was part of Metro:

> The accounting department processed the time sheets, or the time records, for the employees and sent that down to the Metro Government who processed the final payroll checks for the employees.

When asked how nurse practitioners who worked as MLEs were paid, Mr. Latham explained that invoices were prepared, the Department of Finance processed the invoices

-5-

through accounts payable, and then the invoice was sent to Metro to pay by issuing a check. Vendor numbers were associated with an individual or company that provided an invoice to be paid, and Ms. Snedegar, as an MLE, was assigned a vendor number.

Mr. Latham was asked whether payroll had a specific account number, and he replied "yes." He was then asked whether Ms. Snedegar was paid out of the payroll subaccount, and Mr. Latham replied "she was not." The questioning continued:

Q: Okay. Do you know what subaccount [Ms. Snedegar] was paid out of?

A: Professional services.

Q: Okay. Can you give me an overview of what professional services would include?

A: Professional services are usually related to physician or that type of services that would be rendered by a nurse practitioner, by a physician, by someone with - - that would bill us basically for services rendered, not for time.

Q: Okay. And you - - you testified that in the accounts payable system a person would have a number associated with them?

A: Yes.

Q: Okay. If an individual were, in fact, paid out of the subledger associated with payroll, would they also have some sort of an account number associated with them?

A: All employees have an employee number.

Q: Okay.

A: But that's totally different from a vendor number.

Q: Okay. Okay. Let me ask my question this way: Did Ms. Snedegar have a number in that payroll account?

A: No.

Q: Okay. If she had been an employee, would she have had a number in that payroll account?

A: Yes.

. . . . .

Q: She did not have a number in that payroll account?

A: She did not.

Q: Okay. Her number was a vendor number in the accounts payable account?

A: That is correct.

. . . . .

Q: Okay. Did Ms. Snedegar - - was she issued a W-2 in 2004?

A: No.

Q: Okay. And who are W-2s issued for?

A: Employees.

. . . . .

Q: Okay. Did the hospital authority issue some sort of a tax record to her?

A: I believe Metro Government sent her a 1099.

. . . . .

Q: Okay. And what individuals were issued a 1099?

A: People who were considered contract labor, or professional fees, those types of deals.

Q: Okay. Were - - individuals who were paid out of that professional

services account, were they issued a 1099?

A:  Yes.

. . . . .

Q:  Which accounts were the advanced practice nurses in the medical-legal - - legal exam program paid from?

A:  They were charged to the general ledger expense account, professional services.

Q:  And that was not the same as a payroll account?

A:  Not the same as a payroll account.

Q:  Were any payroll withholdings or taxes taken out of those payments?

A:  No.

Mr. Latham was asked about the pay stubs attached to Ms. Snedegar's paychecks, and whether by looking at her pay stub Ms. Snedegar could know she was not being paid by a payroll department.  Mr. Latham responded:

Well, there was no payroll info - - no withholdings, no FICA expense, nothing telling her she had any withholdings.  If she'd have been an employee, she would have seen withholding taxes, FICA taxes, all that information on her pay stub.  And that information was not on her pay stub.  And normally it tells you at the top that it is from the payroll dep - - you know, it's a payroll check.

Mr. Latham continued:

There was no payroll information on the stub.  If - - if it had been a payroll check, there would have been that payroll information.

To determine the meaning of § 29-20-107(a)(2), it is necessary to put that section into context and understand how the provision fits in with the overall purpose of the GTLA.  The GTLA codified the doctrine of sovereign immunity for governmental entities engaged in governmental functions unless a specific exception in the GTLA removes or limits the immunity.  Tenn. Code. Ann. § 29-20-201(a); *City of Lavergne v. Southern Silver, Inc*., 872

-8-

S.W.2d 687, 690 (Tenn. Ct. App. 1993); *Brown v. City of Memphis*, 1998 WL 742385, at \*2 (Tenn. Ct. App. Oct. 22, 1998).

The GTLA removes immunity from suit of all governmental entities for injuries proximately caused by a negligent act or omission by any of its employees acting within the scope of his or her employment, unless an injury results from particular acts that are not relevant to this appeal. Tenn. Code Ann. § 29-20-205; *see* Tenn. Code Ann. § 29-20-205(1)-(9) (list of exceptions to removal of immunity for governmental entities). In construing the GTLA, our Supreme Court has explained:

> It is well-settled that the role of this Court in construing statutes is to ascertain and give effect to the legislative purpose and intent without unduly restricting or expanding a statute's coverage beyond its intended scope. The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application. Courts are not authorized to alter or amend a statute, and must presume that the legislature says in a statute what it means and means in a statute what it says there. This last principle applies especially when analyzing the GTLA, as the legislature created this Act in derogation of the common law, and therefore, the Act must be strictly construed.

*Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 83 (Tenn. 2001) (quotations and citations omitted).

NGH's immunity for damages from the Bakers' lawsuit will only be removed if Ms. Snedegar can show "strict compliance" with the terms of the GTLA. Tenn. Code. Ann. § 29-20-201(c); *see Halliburton v. Town of Halls*, 295 S.W.3d 636, 638 (Tenn. Ct. App. 2008) (governmental immunity from suit may only be removed where there is strict compliance with requirements of GTLA). To show strict compliance with the terms of the GTLA, Ms. Snedegar must show she is an "employee" of NGH, the governmental entity at issue, as that term is defined.

The Bakers acknowledge the first requirement of the statute at issue has been met, *i.e.*, that NGH selected and engaged Ms. Snedegar to perform services as an MLE. Tenn. Code Ann. § 29-20-107(a)(1). The Bakers also acknowledge the first part of the second requirement has been met, *i.e.*, that NGH (or Metro) was liable for the payment of

compensation for Ms. Snedegar's performance of the MLE services.[2]  Tenn. Code Ann. § 29-20-107(a)(2).  The parties' dispute centers on the second requirement of subsection 107(a)(2), that Ms. Snedegar received her compensation "directly from the payroll department" of NGH, or Metro in this case.

Ms. Snedegar does not question Mr. Latham's testimony that Metro had two accounts in 2004 from which paychecks were issued:  the payroll account and the professional services account.  Further, she does not dispute that she was paid from the professional services account rather than from the payroll account.  The essence of Ms. Snedegar's argument is that regardless of the account from which she was paid, she received all of her compensation "directly from the payroll department of the governmental entity in question."  She makes this argument because Metro did not have a department called the payroll department, and she was paid by the same **department** that paid everyone else who worked at NGH:  Metro's Department of Finance.  Thus, Ms. Snedegar argues, she satisfies the second requirement of § 29-20-107(a)(2).[3]

According to Ms. Snedegar's interpretation of § 29-20-107(a)(2), every recipient of a check from the Department of Finance, for any goods supplied to or service performed for NGH, would be a governmental employee for purposes of this section of the GTLA.  It defies common sense to believe the General Assembly intended NGH to assume liability for an individual who is a vendor or independent contractor, as it does for a full-time staff person employed by Metro, simply because the same Department of Finance writes the checks to compensate each of these individuals for his or her services.  According to Ms. Snedegar's argument, any vendor attorney who provides services, or anyone else receiving a check from Metro should be considered a governmental employee for purposes of § 29-20-107(a)(2) because each is compensated by Metro's Department of Finance.

Ms. Snedegar's interpretation renders the second requirement of subsection 107(a)(2) meaningless and ignores the term "payroll" the General Assembly used in the statute.  Mr. Latham testified that the Department of Finance had two different subaccounts, a payroll account and a professional services account.  Mr. Latham explained that NGH employees had employee numbers assigned to them, they were paid from the payroll account, they received W-2 forms at the end of the year, and they had taxes and other withholdings deducted from their paychecks.

---

[2]The parties agree that Metro, not NGH, paid the individuals working at NGH.

[3]Ms. Snedegar suggests the legislature put the word "payroll" in the statute to distinguish between those paid by the governmental entity as opposed to those paid by a third party, such as a private foundation.

Vendors and professional independent contractors, on the other hand, were paid for particular services and submitted invoices for payment. These individuals or companies were assigned a vendor number and were paid from an account other than the payroll account that Mr. Latham referred to as a professional services account. The individuals and entities paid from the professional services account received 1099s at the end of the year; they did not receive W-2s as those assigned an employee number and paid from the payroll account did.

Ms. Snedegar was assigned a vendor number rather than an employee number, she submitted an invoice for her services rendered, and she received a 1099 at the end of the year. In addition, she was paid from the professional services account, not from the payroll account. The fact that Metro's Department of Finance issued her paychecks does not transform her into a Metro or NGH employee, as she contends. We therefore affirm the trial court's judgment denying Ms. Snedegar's motion for summary judgment because she failed to prove she received her compensation from Metro's payroll department.[4]

## IV. CONCLUSION

The trial court's judgment denying Ms. Snedegar's motion for summary judgment is affirmed. Costs of this appeal shall be assessed against the appellant, Deborah A. Snedegar, for which execution shall issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[4]The Bakers appeal the trial court's determination that Ms. Snedegar satisfied § 29-20-107(a)(3) and (5) as modified by subsection (e). In light of our holding that Ms. Snedegar fails to satisfy the second part of subsection § 29-20-107(a)(2), we need not address whether or not the trial court erred in ruling that Ms. Snedegar satisfied subsections 107(a)(3) and (5).